22729. ANDERSON *et al. v.* KENNEDY.

DECIDED AUGUST 23, 1933.

*Lovejoy & Mayer, Wheeler & Kenyon,* for plaintiffs in error.
*C. N. Davie, J. F. Kemp, A. O. Randall,* contra.

BROYLES, C. J.  Harvey J. Kennedy brought an action for libel against T. M. Forbes, D. W. Anderson, and several other persons, alleging that the defendants were members of the Cotton Manufacturers' Association of Georgia, an unincorporated association, whose object was to promote the textile industry within this State, and that the defendants, through their agent and secretary, T. M. Forbes, published a letter referring to the plaintiff (who was an attorney at law, and at the time of the publication a candidate for Congress) which was libelous per se and which injured and damaged him in stated ways and amount.  The defendants demurred to the petition; an amendment to the petition was allowed over the objections of the defendants; the original and additional demurrers were urged to the petition as amended, and all the demurrers, general and special, were overruled.  The defendants excepted to the judgments allowing the amendment to the petition and overruling the demurrers to the amended petition.

The alleged libelous letter is as follows:  "It was announced in the Atlanta papers a few days ago that Mr. Harvey Kennedy, of Barnesville, who is a member of the Georgia legislature, has announced his candidacy for election to Congress from the sixth district to fill the vacancy created by the recent death of Congressman Rutherford.  I have no intention of presuming to suggest how you should vote in this matter, but I think you should know that during the regular session of the Georgia legislature in 1931, Mr. Kennedy was very closely allied with the labor unions, and used his influence in every way possible to secure the enactment of bills sponsored by organized labor.  On the last night of the regular session it was Mr. Kennedy who led the fight to bring up some of the bills to which we were vigorously opposed, and in discussing these measures it was clearly evident that his attitude toward industry is anything but fair.  It occurs to me that it would not be helpful to have a man with Mr. Kennedy's views in Congress, so I am passing this information along to you for whatever it may be worth, and requesting that you treat it in the strictest confidence.  Sincerely yours, T. M. Forbes, Secretary."  The petition alleged that the association, in furtherence of its object to promote the textile industry within this State, advised its members and the public, by publications and the like, of anything which might be considered inimical to their interest, and that Forbes, in writing the letter, was acting within the scope of his authority.

382

In order to constitute libel, the foregoing letter must contain false and malicious defamation of the plaintiff, tending to injure his reputation and exposing him to public hatred, contempt, or ridicule. Civil Code (1910), § 4428. The petition alleges as libelous per se the following parts of the letter: "That during the regular session of the Georgia legislature in 1931, Mr. Kennedy was very closely allied with the labor unions, and used his influence in every way possible to secure the enactment of bills sponsored by organized labor;" and "that his attitude towards industry is anything but fair." We have carefully considered these parts of the letter and the letter as a whole from every angle, and have concluded that it contains no language which is libelous per se. It charges no crime, dishonesty or immorality on the part of the plaintiff, and does not charge that he did any act which was unlawful or which he did not have the right to do. To publish that a member of the legislature was very closely allied with some criminal or corrupt organization might be a reflection upon the member's integrity, motives, and character, and possibly would expose him to public hatred, contempt, or ridicule, but the language of the instant publication, to wit, that the plaintiff "was very closely allied with the labor unions, and used his influence in every way possible to secure the enactment of bills sponsored by organized labor," cast no imputation upon the plaintiff's character and was not actionable per se. This court will take judicial cognizance of the well known historical fact that the birth of labor unions originated from the necessity of the laboring individuals to protect themselves from the more powerful groups of industry by organization and a united front, and that labor unions are necessary as checks and balances in the industrial life of the nation. Nor is the statement in the publication that during the session of the legislature "it was clearly evident," from the plaintiff's discussion of bills opposed by the Cotton Manufacturers' Association of Georgia, "that his attitude towards industry is anything but fair," libelous per se. Immediately following this statement in the letter, the writer thereof continues as follows: "It occurs to me that it would not be helpful to have a man with Mr. Kennedy's views in Congress, so I am passing this information along to you for whatever it may be worth, and requesting that you treat it in the strictest confidence." The letter, properly and fairly construed, merely says, in effect, that the

plaintiff, by his actions in the legislature of Georgia, has shown that his sympathies are with the labor unions and against the textile industries, and that such industries feel that it is not fair to them to have in Congress a man, holding such views. There is no statement or suggestion in the letter that the plaintiff was not an honest and upright legislator, or that his viewpoint upon the bills sponsored by the labor unions was not conscientious and believed by him to be proper and correct, or that he was not within his strict legal and moral rights in entertaining it. The writer of the letter was the secretary of a textile association, and it is obvious from the letter that, because of the plaintiff's views upon the questions affecting industry and labor unions, the writer thought that the plaintiff's election to Congress might be prejudicial to textile industries, and, therefore, he was exercising his right in attempting to defeat him, as he or any other person so believing had the right to do. It is well known that when the interests of industry and labor unions conflict, there are many legislators who favor the interest of the unions, and many others who are partial to the interest of industry. The mere fact that a member of the legislature supports certain bills sponsored by the labor unions and opposed by industry is no reflection whatsoever on his character, private or public; and the statement in the publication, that the legislator by so favoring the bills showed that "his attitude towards industry was anything but fair," was not actionable per se. In *Watlers* v. *Retail Clerks Union,* 120 *Ga.* 424 (47 S. E. 911), it was held that a publication stating that the plaintiffs (who were merchants) had been placed on the "unfair list" (the publication stating the facts and reasons why the plaintiffs were so placed) "cast no imputation upon their character as individuals or upon their solvency or standing as merchants," and "the words were not actionable per se." And in that case Justice Lamar, speaking for the court, said: "In cases of this sort the publication must be construed as a whole, and in the sense in which it is evident the language was intended to be used. Under this rule words ordinarily harmless may from the context convey such a meaning as to give ground for an action. On the other hand, words which are sometimes actionable may, when taken in connection with the entire article, be deprived of their usual sting and afford no ground for a recovery. So the word 'unfair' may sometimes mean 'dishonest,' and, when by a colloquium

or innuendo shown to have this meaning, might give rise to a cause of action. But it does not necessarily involve so serious a charge. It may convey the idea of 'discrimination.' It may mean that one is 'prejudicial' or 'partial.' It may mean 'illiberal,' 'hard,' 'ungenerous,' or 'exacting.' But whatever the sense in which it may on occasions be used, it is perfectly evident that in the present case it imputed nothing involving moral turpitude to the firm or to the indivduals composing it, and cast no imputation upon their credit, solvency, or conduct as merchants. Reading the publication as a whole, there was no suggestion of the use of short weights or measures, no accusation of fraud, deceit, or misrepresentation in the sale or purchase of goods. Nor did it charge anything against the honesty, integrity, solvency, or credit of the partnership. A state of facts was given. The words 'unfair' and 'unfair list' were coupled with these facts, and amounted to a characterization or statement of what defendants thought of plaintiffs' refusal to become a party to the early closing movement. Anyone reading the communication must have seen that the plaintiffs were not charged with overstepping their rights or doing anything unlawful. . . A case even more in point was that of Donaghue v. Gaffy, 53 Conn. 43 (2 Atl. 397), where the defendant published that because he had quit buying from plaintiffs they privately overbid him and by 'base treachery' secured the property which he had leased, and ordered him immediately to vacate. After stating these facts, the defendant in the article alleged to be libelous added: 'The firm is not worthy of our support, being guilty of foul and *unfair* dealings to "get square," as they say, with one who exercises the right to trade where he likes; and I . . request those who believe in the fair thing as between man and man to give their support to some other house.' It was there held (citing Homer v. Englehardt, 117 Mass. 539) that the words were not actionable per se, the whole publication showing that the transaction was perfectly lawful; and, that in the absence of an allegation of some special damage, the court could not legally presume that the plaintiffs were degraded in the estimation of the public, or that they suffered loss of character, profits, or business. See also Railroad v. DeLany, 102 Tenn. 289 (52 S. W. 151, 45 L. R. A. 600), where an employee sued for general damages alleged to have resulted from a false publication that he had gone on a strike. The blacklisting cases, like that of *White*

v. *Parks*, 93 *Ga.* 633 (20 S. E. 78), cited for the plaintiffs, do not apply, because there the words were actionable per se, as they tended to lessen the plaintiff's credit, charging as they did that he was a delinquent debtor, guilty of dishonest and fraudulent methods. Here the publication was not per se libelous, and no special damages are set out. The judgment sustaining the demurrer is affirmed."

The words complained of in the instant case, as in the *Watters* case, when read in the light of the publication as a whole, imputed nothing involving moral turpitude to the plaintiff and cast no imputation upon his character as a citizen or as a member of the legislature. We can say in this case, as Justice Lamar said in the *Watters* case: Anyone reading the communication must have seen that the plaintiff was not charged with overstepping his rights or doing anything unlawful. The publication in the instant case was not per se libelous, and the petition failed to set out any proper or legitimate item of special damages. The allegations as to special damage were, first, the expense incurred by the plaintiff in answering the charges made in the publication; and secondly, his defeat in the election for congressman. As to the first item: "Necessary expenses consequent upon the injury done are legitimate items of damage in personal injury cases only, and the rule is entirely inapplicable in a slander [or libel] suit." *Sammons* v. *Wilson*, 20 *Ga. App.* 241 (2) (92 S. E. 950). As to the second item: Loss of office by a candidate can not be said to be the natural, immediate, and legal consequence of an alleged libelous charge and due exclusively to it. Special damages for loss of office have no proper place in a suit for libel brought by a candidate, for the reason that such damages alleged are too remote and speculative to justify serious consideration. Taylor v. Moseley, 170 Ky. 592(4), 599 (186 S. W. 634, Ann. Cas. 1918B, 1125).

Having ruled that the instant publication contained no language which was libelous per se, and that the petition failed to set out any proper or legitimate item of special damage, we shall now consider whether the petition contained any sufficient innuendo. If defamatory words not libelous per se are to be held actionable because of a covert meaning, "it is necessary for the pleader to aver that the author of the libel intended them to be understood, and that they were in fact understood by those who read them, in their covert

sense." *Behre* v. *National Cash Register Co.*, 100 *Ga.* 213, 216 (27 S. E. 986, 62 Am. St. R. 320) ; Maynard *v.* Fireman's Ins. Co., 47 Cal. 207. Conceding (but not deciding) that the alleged defamatory words in the instant publication were susceptible of conveying a covert meaning "wholly different from the ordinary and natural interpretation usually put upon them," the amended petition did not allege, directly or indirectly, that the defendants "intended them to be understood, and that they were in fact understood by those who read them, in their covert sense." The petition, therefore, did not show by way of an innuendo that the language complained of was actionable.

In view of the foregoing rulings which hold that, for the reasons therein given, the amended petition failed to set out a cause of action, it is unnecessary to consider the question whether the alleged defamatory publication was a privileged communication.

Conceding (but not deciding) that the amendment to the petition was properly allowed, the petition as so amended did not set out a cause of action against any of the defendants, and the court erred in overruling the general demurrers.

*Judgment reversed. MacIntyre and Guerry, JJ., concur.*